IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| MARIA SPIDA,<br><br>             *Plaintiff*,<br><br>v.<br><br>BAE SYSTEMS INFORMATION<br>SOLUTIONS, INC.,<br><br>             *Defendant*. | Civil Action No. 1:16-cv-979<br><br>Hon. Liam O'Grady |

## MEMORANDUM OPINION

Maria Spida is a 68-year old woman who was terminated from her employment at BAE Systems Information Solutions, Inc. ("BAE") on November 20, 2014. Her amended complaint alleges counts of: (1) Discrimination, Retaliation, and Hostile Work Environment under the Americans with Disabilities Act ("ADA"); (2) Discrimination, Retaliation, and Hostile Work Environment in violation of the Age Discrimination in Employment Act ("ADEA"); and (3) Interference with Rights and Retaliation under the Family and Medical Leave Act ("FMLA"). Defendant has moved to dismiss some claims in their entirety and partially dismiss others. (Dkt. No. 17). The Court heard oral argument on November 10, 2016.

In its motion, Defendant does not challenge Count I (ADA Discrimination) or Count IV (FMLA Interference with Exercise of Rights); however, it has moved to dismiss Count III and Count VIII (ADA and ADEA Hostile Work Environment claims) in their entirety. It has further moved to dismiss Count II (ADA Retaliation), Count V (FMLA Discrimination/Retaliation),

Count VI (ADEA Discrimination), and Count VII (ADEA Retaliation) to the extent they seek recovery relating to a July 2013 decision by BAE to not promote/hire Ms. Spida to a new position. For the reasons that follow, Defendant's motion is **GRANTED** in full.

## I. BACKGROUND

Ms. Spida began working with BAE on July 30, 2001 as an executive assistant. Compl. ¶ 10. From that time until 2008, she was promoted to senior executive assistant, executive assistant for business development capture, project administrator, and business development representative. *Id.* at ¶ 13. In her position as BD representative, Plaintiff worked implementing GovWin software for her assigned business area and processing IDIQ task orders. *Id.* Her supervisor was Richard Zelkowitz, the director of BD operations. *Id.*

Plaintiff suffers from osteoarthritis and polymyalgia rheumatic, an autoimmune disease. *Id.* at ¶ 14. As a result, beginning in August 2007, Plaintiff took twelve weeks of pre-approved FMLA leave to have her right knee replaced. *Id.* at ¶ 15. In August 2008, she took another twelve weeks of pre-approved time for a left knee replacement. *Id.* at ¶ 16. On account of her conditions and the resulting knee procedures, and in order to reduce the possibility of further knee complications, Plaintiff's doctor instructed that she not drive for more than 30 minutes at a time. *Id.* at ¶ 18. This driving restriction limited the offices at which she could work. *Id.*

On two occasions, Defendant attempted to transfer Plaintiff to a different office. First, in May 2010, the sector headquarters were moved from Reston to Arlington, VA, and Plaintiff was notified that she would have to move. *Id.* ¶ 20. In response, Plaintiff told Mr. Zelkowitz that this commute would violate her medical restrictions. *Id.* She further reminded him that she could perform her duties "fully and effectively from the Reston office." *Id.* Mr. Zelkowitz told Plaintiff that she would be fired if she did not move with the office to Arlington. *Id.* ¶ 21.

Following this "ultimatum," Plaintiff submitted a request for accommodation under the ADA on the basis of the driving restriction. *Id.* ¶ 22. Defendant granted this request three months later, in August 2010. *Id.* ¶ 23. Next, in April 2012, Plaintiff was advised that her office location would be moved to Herndon, VA. *Id.* ¶ 24. During rush hour, this commute was longer than 30 minutes, so Plaintiff applied for, and received, an ADA accommodation to commute to the office after rush hour. *Id.* ¶ 26.

Plaintiff continued to perform her job in a satisfactory manner. In December 2012, Plaintiff was given IDIQ monitoring responsibilities in addition to her previous job of disseminating IDIQ task orders. *Id.* ¶¶ 27-28. In January 2013, she received a promotion and a salary increase. *Id.* ¶ 28. She alleges, however, that this raise was less than that of two of her younger peers in the BD department received. *Id.*

Shortly thereafter, in May 2013, Mr. Zelkowitz announced that the BD department, consisting of Plaintiff and three others, was being dissolved and restructured and that each employee would each have to apply for new positions in the department. *Id.* ¶ 29. All of these positions would be moved to Defendant's office in McLean, VA, which would have required Plaintiff to commute more than 30 minutes. *Id.* Mr. Zelkowitz again stated that if Plaintiff was unwilling to work from McLean, she would not be selected for one of the available positions. *Id.* ¶ 30. The four new positions were officially posted in July 2013. *Id.* ¶ 31.

Plaintiff applied for three of the four positions but did not receive any of them. One of the positions, a Document Specialist post, was given to a 22-year old woman named Kaitlyn Rackens, who had recently graduated from college. *Id.* ¶ 33. According to the complaint, the position's requirements and salary had been specifically tailored to Ms. Rackens. *Id.* ¶ 33. Despite the fact that Plaintiff had trained Ms. Rackens on the necessary software and had

previously performed the responsibilities of this position, Mr. Zelkowitz claimed that the interview panel thought Ms. Rackens was more qualified for the position. *Id.* Plaintiff was also passed over for a Research position, which was given to Julia Perez-Melendez, who is in her late-thirties. *Id.* ¶ 34.

The final position to which Plaintiff applied was an IDIQ monitoring position. *Id.* ¶ 35. This job was substantially the same as the position that Plaintiff held before the restructuring except that it now required travel to customer sites in Washington, D.C. *Id.* Plaintiff alleges that this requirement was specifically intended to disqualify her from consideration. *Id.* In late July 2013, Mr. Zelkowitz informed Plaintiff that she had not been selected for the IDIQ Monitoring position even though Defendant had not made any other selection for that position. *Id.* ¶ 36. Indeed, even at the time this suit was filed, the position remained vacant. *Id.* Despite her non-selection for the position, Plaintiff continued to perform IDIQ monitoring duties until September 2014, one month before her termination. *Id.*

Plaintiff complained about the dissolution of her division and her non-selection for the new positions. First, after learning that the division was being dissolved, she met with her designated HR representative, LaVerne Bonelli to discuss her concern that the move was a precursor to her termination. *Id.* ¶ 36. After her non-selection, Plaintiff gave notice of a complaint for discrimination and retaliation against Mr. Zelkowitz. *Id.* The complaint ultimately included allegations of "discrimination based on her disability and retaliation based on requesting accommodation under the ADA, retaliation for having taken FMLA leave," and age discrimination. *Id.* ¶ 38. She discussed this complaint with Ms. Bonelli on August 21, 2013, and further discussed it in a meeting with Mr. Zelkowitz and Jeanie Hill, Ms. Bonelli's supervisor, on August 29, 2013. *Id.* ¶¶ 38-39.

Beginning on September 11, 2013, Plaintiff again took seven days of pre-approved FMLA leave to take care of her husband after surgery. *Id.* ¶¶ 41-42. Then, from September 19, 2013 to May 21, 2014, Plaintiff took three hours of pre-approved FMLA leave per day at the instruction of her orthopedic surgeon. *Id.* ¶ 43. When this federally-mandated leave expired, Plaintiff transitioned to receiving leave under Defendant's supplemental FMLA policy, managed by Cigna. *Id.* ¶ 45. The same day that Plaintiff transferred to the supplemental policy, Michelle Vaz, the new HR representative, informed her that she was being transitioned to part-time employment. *Id.* ¶ 47. According to Plaintiff, this violated the company's internal policy. *Id.* ¶¶ 46-48. Thereafter, Plaintiff met with Ms. Vaz to discuss her reclassification and her job protection. *Id.* ¶ 48. At that time, Plaintiff also renewed her previous discrimination complaint and provided Ms. Vaz with documentation of her medical condition. *Id.* ¶¶ 49-50.

In September 2014, Mr. Zelkowitz notified Plaintiff that she was no longer to perform the IDIQ monitoring. *Id.* ¶ 52. As a result, Plaintiff requested new work or a new position "as an accommodation" but Mr. Zelkowitz did not respond to this request. *Id.* ¶ 53. In October 2014, Joseph Chioda took over as Vice President of BD operations (Plaintiff's division), but Mr. Zelkowitz remained as Plaintiff's boss. *Id.* ¶ 55. On October 14, Plaintiff met with Ms. Vaz and another HR representative to discuss her concerns about Mr. Zelkowitz's alleged discrimination. *Id.* ¶ 56. After this meeting, she did not hear anything from Defendant until a November 6, 2014 meeting in which Mr. Zelkowitz informed her that she was being laid off, effective November 20, 2014. *Id.* ¶ 58.

Plaintiff filed her complaint with the EEOC on January 15, 2015, and the Commission issued a Right to Sue Notice on June 23, 2016. *Id.* ¶ 7.

## II. LEGAL STANDARD

In assessing a motion to dismiss, the court must assume all well-pled facts to be true, and draw all reasonable inferences in Plaintiff's favor. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). However, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Id.* at 255 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The "'[f]actual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n. 26 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## III. DISCUSSION

This motion can be divided into two primary issues of law. First, the motion to partially dismiss Counts II, V, VI, and VII turns on a question of claim accrual. The Court finds that these claims accrued in July 2013, when Ms. Spida was notified that she was not selected for the IDIQ position, and they are therefore time-barred under the relevant 300-day statute of limitations. Second, with regard to the motion to dismiss the ADA and ADEA Hostile Work Environment claims, the Court finds that Plaintiff has not alleged sufficient facts to support her allegations of a hostile work environment. These two issues will be addressed in turn.

### A. Claim Accrual Date

The claim accrual date has dual significance. For the discrimination and retaliation claims in Counts II, VI, and VII, the issue is a simple matter of comparing the claims' accrual date to the applicable statute of limitations. For the FMLA claims, the related issue is whether a July 2013 accrual date would defeat any causation argument because it would mean that the

relevant FMLA leave was taken nearly five years before any adverse employment action. These arguments are also taken in turn. The third portion of this section will clarify the scope of this Order.

### 1. *Discrimination and Retaliation*

Because Virginia is a "deferral" state, the parties agree that a 300-day statute of limitations applies to this action. *See* 42 U.S.C. § 2000e-2(a)(1); *see also Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 440 (4th Cir. 1998). Plaintiff filed her EEOC charge on January 15, 2015, and therefore any action or incident occurring prior to March 22, 2014 would be time barred. Consequently, the key inquiry centers on the date of accrual.

Defendant argues that the claims accrued on July 2013, when Plaintiff was informed that she would not receive the newly-posted IDIQ monitoring position. In response, Plaintiff quotes a passage from *Williams v. Giant Food Inc.* stating that "it is the date of the actual promotion decision and not the date of ultimate assignment (or any other date) that determines the timeliness of Williams's claims." 370 F.3d 423, 428 n.2 (4th Cir. 2004). As such, she argues that "it is the date that Defendant *made the actual decision as to who to promote* that is relevant for determining when the claim begins to run." Opp'n at 7 (emphasis in original). Because Defendant has yet to fill the IDIQ monitoring position, she asserts that the statute of limitations has not yet run, or alternatively, that her claims accrued on the day she was terminated.

As a general matter, claims for discrete employment actions such as the failure to promote, termination, denial of transfer, or refusal to hire all accrue on the date that they occur. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). In *Morgan*, the Supreme Court differentiated between discrete acts, which have a definitive accrual date, and continuing violations, like hostile work environment claims, which could span longer periods of time. *Id.* at

7

114-15. The Eastern District of Virginia has held on multiple occasions that the "300-day period begins to run 'from the time at which the employee is informed of the allegedly discriminatory employment decision, regardless of when the effects of that decision come to fruition.'" *Panyanouvong v. Vienna Wolftrap Hotel*, 525 F. Supp. 2d 793, 796 (E.D. Va. 2007) (quoting *Connolly v. Mills Corp.*, 430 F.Supp 2d 553, 557 (E.D. Va. 2006).

In *Williams*, the Fourth Circuit held that the date of the discriminatory promotion decision governed the accrual of Plaintiff's claims. 370 F.3d at 428 n.2. In other words, the claims accrued on the date the employees were selected for the positions instead of plaintiff as opposed to the date they actually began working in their new position. *Id.* Holding that the selection dates were the determinative events, the court denied plaintiff's claims as time-barred because those dates all fell outside of the limitations period. *Id.*

Relying on *Williams*, the District Court for the Northern District of Oklahoma found that "[i]n determining when a failure to promote claim accrues, it is the date the employer fills the position to the exclusion of plaintiff that determines the timeliness of the claim." *Doyle v. Nordham Group, Inc.*, 2010 WL 5141274 at *5 (N.D. Okla. Dec 13, 2010). In that case, Plaintiff had originally been denied the position in April 2007 (outside the limitations period), but had been told that he would be reconsidered for the position in January 2008 "if he had an acceptable performance rating and the position was still open." *Id.* Indeed, Mr. Doyle remained eligible for promotion until December 2008 (within the limitations period), when the position was finally filled by someone else. *Id.* Therefore, because his initial denial was equivocal, therefore, Mr. Doyle's claim did not accrue until it became certain that he would not receive the position. *Id.*

Applying this caselaw, Plaintiff's claims based on her non-selection for the IDIQ monitoring position are time-barred. Critical to this conclusion is the fact that Defendant has not

8

taken *any* action related to that position within the limitations period. Plaintiff has not alleged any discrete acts after the July 2013 conversation when Defendant told her that she would not be selected for the position. Defendant has not hired anyone since then, and it did not otherwise indicate that Plaintiff would be reconsidered for the position. Moreover, Plaintiff apparently recognized the "discrimination" shortly after the July 2013 non-selection decision because she filed a complaint concerning Defendant's actions shortly thereafter. Because of Plaintiff's knowledge, there is no question of a "delayed discovery" or "delayed effects" argument that could potentially toll the statute of limitations. Although *Doyle* suggests that the statute of limitations may extend so long as Plaintiff has not been definitively rejected from the position, Plaintiff has not alleged any facts to show that she thought she was being reconsidered for the job after she was told she did not receive it. As such, Ms. Spida's case is distinguishable from the cases of *Williams* and *Doyle*, in which the defendants both found replacements for the positions that the plaintiffs sought, and the plaintiffs were also held in limbo over the hiring decision. Furthermore, in those cases, there was a separate discrete act (the hiring of a new employee) to which the accrual date could attach.

This conclusion is reinforced by an examination of *Morgan*, discussed above. There, the Supreme Court differentiated between hostile work environment claims, which could continue for periods of time between discrete acts of harassment, and the discrete acts of discrimination or retaliation, which accrue on the date they occur. In the course of its discussion, the Court identified failure to promote and failure to hire claims as discrete acts. Thus, the continuing violations doctrine does not apply for discrimination based on those discrete acts. This holding would be undermined by Plaintiff's theory of accrual because it would transform her non-selection claim into a continuing violation that would occur indefinitely until Defendant filled

the position. Indeed, under this theory, the limitations period would never expire if Defendant decided not to fill the position. This result would undermine the basic principles underlying the statute of limitations.

This case does not present the more difficult problem of deciding the claim accrual date when a non-hiring decision and a replacement hiring decision straddle the limitations period. For example, if Defendant had filled the IDIQ monitoring position with a younger, non-disabled person after March of 2014, Plaintiff might have been able to tie her claim to that discrete act. In this case, however, it is enough that Defendant did not complete any relevant discrete act within the limitations period. *See Morgan*, 536 U.S. at 117. For non-promotion or non-hiring claims, it is only logical that the Defendant must have completed *some* act related to the non-promotion decision within the limitations period in order for the claim to accrue. Here, the only non-selection action which could have been discriminatory was the conversation in July 2013, and her claims are necessarily tied to that discrete act.

2. *FMLA Claims*

Plaintiff's FMLA claims based on the non-selection decision are dismissed for similar reasons. Defendant does not argue that these claims are specifically time-barred, but instead asserts that, because Plaintiff's last FMLA leave prior to the July 2013 non-decision was in 2008, the lapse of time renders any causation argument too attenuated to be cognizable. Plaintiff counters by suggesting that the 2007 and 2008 FMLA leave periods were only provided as background information, and that the actual non-decision claim accrued when she was terminated in November 2014. This occurred much closer in time to her September 2013 FMLA leave and the ongoing 3-hours-per-day FMLA leave thereafter. Therefore, she alleges, it is permissible to infer a causal connection. The Court disagrees.

To state a prima facie case of FMLA retaliation, Plaintiff must show (1) that she engaged in a protected activity; (2) that her employer took adverse action against her; and (3) that the adverse action was causally connected to her protected activity. *Ranade v. BT Americas, Inc.*, 581 F. App'x 182, 183 (4th Cir. 2014). "When temporal proximity is the sole basis of establishing the requisite causal connection in a FMLA retaliation claim, a substantial lapse in time between the protected activity and termination belies any inference of a causal connection between the two." *Byington v. NBRS Fin. Bank*, No. CIV.A. GLR-12-705, 2013 WL 3895033 at *3 (D. Md. July 26, 2013) (citing *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006); *see also Ranade* 581 F. App'x at 183 (finding that a gap of six months undermined plaintiff's claim of causation). In *King v. Rumsfeld*, the Fourth Circuit found that a time lapse of two months and two weeks "weaken[ed] significantly the inference of causation" but did not defeat it because the adverse employment action came at the end of the school year and thus was a natural time for the discharge to occur. 328 F.3d 145, 151 n.5 (4th Cir. 2003). Therefore, the *King* court found a specific reason to credit the claims of causation despite the fact that the causal connection was "weakened significantly" by the passage of time. *Id.*

Here, there are no analogous facts to support Plaintiff's attenuated causation argument. As an initial matter, it is implausible that Ms. Spida's FMLA leave in 2007 and 2008 somehow led Defendant to deny her the IDIQ position in 2013. This lapse of five years is much greater than the six months in *Byington* and *Ranade*, and far greater than the two months and two weeks that "weakened significantly" the inference of causation in *King*. Thus, without more, the gap between 2008 and 2013 proves too expansive to support any inference that Plaintiff's FMLA leave led to her non-selection for the IDIQ monitoring position.

11

Plaintiff's creative fallback argument—that the non-hiring decision began in 2013 and was only finalized when she was ultimately terminated—does not fare any better for the reasons discussed in further detail above. Defendant's non-selection decision was finalized vis-à-vis Ms. Spida when Mr. Zelkowitz informed her that she would not be selected for the position in July 2013. Although it is theoretically possible that Defendant could have retracted its previous denial and given her the job, she has not alleged any facts to suggest this was the case. In fact, the requirement that the person in the IDIQ position drive to customer sites outside Ms. Spida's 30-minute range (and Defendant's apparent unwillingness to reconsider that requirement) suggests that it is implausible that she would be considered for the position at any time after her department was restructured.

### 3. *Scope of the Order*

This Order covers all claims based on the fact that Defendant did not select Plaintiff for the IDIQ monitoring position in July 2013. However, it is important to recognize what this Order does not cover. It does not cover retaliation claims based on Ms. Spida's renewed complaint to Ms. Vaz in May 2014. In addition, it does not cover allegations that Defendant stripped Plaintiff of her duties and responsibilities, denied her alleged accommodation request, or terminated her. Defendant does not challenge those allegations at this time, and therefore those claims will proceed to discovery.

### B. Hostile Work Environment

In order to allege a hostile work environment, Plaintiff must show that she was subjected to unwelcome harassment that was severe and pervasive enough to "alter a term, condition, or privilege of employment." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176-77 (4th Cir. 2001). Hostile work environment claims often turn on the question of what constitutes "severe and

pervasive" harassment. *See id.* The Supreme Court has stated that employment discrimination statutes are not to be interpreted as "general civility code[s]" and therefore courts must examine "all the circumstances" to determine whether a hostile work environment objectively exists. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). In conducting this inquiry, courts should examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993).

Though a single discrete act on its own will not usually constitute a pervasive environment of harassment, a series of discrete acts can create such a workplace. *Green v. Brennan*, 136 S. Ct. 1769, 1781 n.7 (2016) (citing *Morgan* 536 U.S. at 115-121). Disagreements with management decisions, however, do not rise to the level of a hostile work environment. *See Hemphill v. UPS, Inc.*, 975 F. Supp. 2d 548, 573 (D.S.C. 2013) (holding that "[b]usiness decisions such as the location of [plaintiff's] desk, the decision to give [plaintiff] a desktop computer instead of a laptop, and the requirement that [plaintiff] notify her superiors of her arrival and departure times do not create an abusive work environment."). Where threats or harassing comments are directed at an individual, however, it may create a question of fact as to whether a hostile work environment exists. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (finding that a supervisor's use of the term "porch monkey" to refer to plaintiff created a disputed issue of fact as to whether a hostile work environment existed); *see also Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (finding that "the various mannequin incidents, the vulgar song and picture, and the graphic descriptions of sexual activity (especially oral sex) that consistently painted women in a sexually subservient and

demeaning light were sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and to create an abusive work environment.").

Plaintiff alleges a laundry list of discrete acts that she believes amount to a hostile work environment, however, these actions are not sufficiently "persistent and severe" and they must therefore fail. Plaintiff's list includes the following: (1) attempting to compel Plaintiff to move office locations twice; (2) threatening termination if she did not agree to move; (3) delaying a decision on Plaintiff's request for accommodation when she stated she would not move; (4) restructuring Plaintiff's business unit and forcing her to apply for new jobs; (5) denying Plaintiff's promotion to three of the positions to which she applied; (6) restructuring one of the new jobs to make it an entry level position; (7) restructuring the IDIQ monitoring position to require travel; (8) denying Plaintiff a promotion to the restructured position but leaving the position open; (9) failing to act in response to Plaintiff's internal complaints; (10) stripping plaintiff of her primary responsibilities; (11) demoting Plaintiff to part-time employee, allegedly in violation of company policy; (12) leaving plaintiff assigned to the same manager when the department was restructured; and (13) terminating Plaintiff within three weeks of her third and final complaint of discrimination and retaliation.

The glaring omission from this list is any action directed *at Plaintiff* that could reasonably qualify as harassment. Though Plaintiff alleges that her department was restructured with the intent to discriminate and retaliate against her, she does not plead any facts to support this conclusory accusation. *See* Compl. ¶¶ 38-40. Indeed, it would be a stretch to classify any of Defendant's actions as objectively offensive. She does not allege any threats, disparaging comments, physical contact, or verbal abuse of any kind, much less harassment based on her age

14

or disability. Furthermore, she does not allege any disparaging remarks made in her presence, much less to her.

Though she summarily claims that some of the company's decisions were motivated by her age or disability, Plaintiff's version of events more plainly paints a picture of an employee who was dissatisfied with the managerial decisions of her company. In the absence of evidence to the contrary, the restructuring of Plaintiff's division appears to be a legitimate business decision rather than an act calculated to discriminate against her. This is especially true given the fact that Plaintiff *never had to violate her medical restrictions, as every accommodation she applied for was granted.* Though she may have been nervous about losing her job as a result of the BD department restructuring, she received the accommodations she requested for 13 years while she worked at BAE, and she cannot point to a single instance in which a fellow employee or supervisor made any comments suggesting Defendant's actions were related to her age or disability.

The closest she comes to a cognizable act of age- or disability-based harassment is her allegation that Defendant tailored the IDIQ monitoring position to a 22-year old college graduate. However, even when taken as true, this does not evince discrimination on its face; it merely suggests that the tasks to be performed in that job were relatively simple. Again, there is nothing beyond the Complaint's conclusory allegations that ties this job classification to Plaintiff's age or disability. It does not come close to the pervasive and severe harassment that courts have held to qualify as a hostile work environment.[1]

---

[1] Given their lack of factual support, Plaintiff's alternative legal theories regarding her hostile work environment claim do not merit any further discussion.

## IV. CONCLUSION

In sum, because Plaintiff's claims regarding her non-selection for the IDIQ monitoring position accrued in July 2013, those claims time-barred. Therefore, the partial motion to dismiss with regard to those claims is **GRANTED**. The partial motion to dismiss the FMLA claims is similarly **GRANTED**. In addition, the motion to dismiss the hostile work environment claims in their entirety is **GRANTED** because the facts as alleged do not amount to a workplace that contains severe or pervasive harassment. Finally, because the Court has already granted leave to amend on one occasion, these claims are dismissed **WITH PREJUDICE**. An appropriate order shall issue.

_____
Liam O'Grady
United States District Judge

December 13, 2016
Alexandria, VA